## LEWIS D. DARBY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 44488-86.     Filed July 24, 1991.

*Clinton Meyering,* for the petitioner.
*Julia A. Caroff,* for the respondent.

CHABOT, *Judge:* Respondent determined a deficiency in Federal individual income tax against petitioner for 1983 in the amount of $19,056.58.

After a concession by petitioner,[1] the issues for decision are as follows:

(1) Whether petitioner properly excluded from income the portion of a lump-sum distribution he received from his employer's profit-sharing plan, which he paid to his former wife pursuant to a court order, on the basis that she (and not he) was the distributee for purposes of section 402(a)(1)[2] for that portion of the distribution.

(2) Alternatively, whether all or any portion of the amount petitioner paid to his former wife is excludable from petitioner's gross income under section 72.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner resided in Farmington Hills, Michigan.

Petitioner's former wife, Yolanda Darby (hereinafter sometimes referred to as Yolanda), was granted a divorce from petitioner on November 8, 1976, by the Circuit Court for Wayne County, Michigan.

---

[1]Petitioner concedes that, due to an error on his 1983 tax return, the capital gain portion of the distribution in issue which was shown on line 1 of his Form 4972 (Special 10-Year Averaging Method) was omitted from the Schedule D to the tax return. Consequently, petitioner concedes about $6,900 of the deficiency.

[2]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

At the time of this divorce, petitioner was a fully vested participant in "The Savings and Profit Sharing Fund of Sears Employees" (hereinafter sometimes referred to as the Sears plan). The Sears plan was a tax-qualified profit-sharing plan under section 401(a).

The "Default Judgment of Divorce" (hereinafter sometimes referred to as the divorce decree) provides, in pertinent part, as follows:

### ALIMONY

IT IS FURTHER ORDERED AND ADJUDGED that neither the Plaintiff [Yolanda] nor the Defendant [petitioner] are entitled to any permanent alimony from each other.

*    *    *    *    *    *    *

### PROPERTY SETTLEMENT

IT IS FURTHER ORDERED AND ADJUDGED that the household furniture, furnishings and appliances owned by the parties hereto and presently in and upon the marital premises of the parties * * * shall on and after this date be the sole and separate property of the Plaintiff, YOLANDA DARBY, free and clear of any claim of the Defendant, LEWIS D. DARBY, and that the personal belongings of the parties be and are hereby awarded to the respective parties as an equitable division and settlement thereof.

[Each is to have the automobile that is registered in that one's name. Each is to have the checking and savings accounts that are registered in that one's name.]

IT IS FURTHER ORDERED AND ADJUDGED that the marital property located at 15410 Greenfield Road, Detroit, Michigan, * * * is hereby awarded to the Plaintiff, YOLANDA DARBY, free and clear of any interest or claim of the Defendant;

IT IS FURTHER ORDERED AND ADJUDGED that the vacant property located at Highland, Michigan, * * * is hereby awarded to the Defendant, LEWIS D. DARBY, free and clear of any interest or claim of the Plaintiff;

IT IS FURTHER ORDERED AND ADJUDGED that the Defendant, LEWIS D. DARBY, shall pay to the Plaintiff, YOLANDA DARBY, the sum of Seventy Five Thousand Dollars ($75,000.00) as follows: The Defendant LEWIS D. DARBY, is to pay the same at the rate of Sixty Dollars ($60.00) per week by way of a wage Assignment, and continue to so pay until such time as the Seventy Five Thousand Dollars ($75,000.00) is paid in full, or Defendant dies, or shall retire from his employment, whichever is sooner, at which time the balance of said sum shall be due and owing to Plaintiff as a lump sum payment, and Defendant hereby ASSIGNS to Plaintiff such portion of his interest in Savings and Profit Sharing Fund of Sears Employes, [sic] necessary to satisfy the balance, determined at the time of his death or retirement as aforesaid, and the

Defendant shall notify said Fund of the above Assignment, and the Assignment, or this Judgment in lieu thereof, may be recorded in the County Register of Deeds or appropriate office, wherein the Fund is located so as to give notice of the same.

IT IS FURTHER ORDERED AND ADJUDGED that the Defendant, LEWIS D. DARBY, is hereby awarded his interest in said Pension and Profit Sharing Plan of Sears, Roebuck & Co., subject, however, to Plaintiff's interest in same as hereinabove set forth.

IT IS [sic] FURTHER ORDERED AND ADJUDGED that each party hereto shall forthwith execute and deliver to the other suitable Quit Claim Deeds Assignments and Bills of Sale to such property to effect such transfer of title, and on the failure thereof, this Judgment shall stand in lieu thereof and a copy of same may be recorded in the Office of the Register of Deed in the County wherein said property is located.

The $75,000 awarded to Yolanda in the divorce decree was determined by reference to the estimated value of petitioner's interest in the Sears plan at the time of the divorce and is about one-half of that value. Both petitioner and Yolanda understood the $75,000 to represent Yolanda's share of petitioner's interest in the Sears plan. The Sears plan was the subject of discussion between petitioner's and Yolanda's attorneys.

Pursuant to the divorce decree, petitioner executed a document entitled "Assignment of Partial Interest of Lewis D. Darby in his Savings and Profit Sharing Fund of Sears Employes" (hereinafter sometimes referred to as the assignment).[3] The assignment,[3] dated October 27, 1976,[4] was directed to the Sears plan and provides in pertinent part as follows:

You are hereby notified that the undersigned has ASSIGNED to YOLANDA DARBY, under Court Order of Judgment of Divorce, * * * the sum of Seventy Five Thousand Dollars ($75,000.00), or the portion of the same, remaining unpaid at the time of my death or my retirement, whichever is sooner, a copy of which Judgment is attached.

This document is your authority to pay moneys which may become due to me under my contract with said [Sears plan], BUT, you are further ordered not to pay any money to YOLANDA DARBY until the amount of the balance of the Seventy Five Thousand Dollars ($75,000.00) due and

---

[3]The use of the word "assignment" is for descriptive purposes only and is not intended to delineate our conclusion as to the legal effect of that document.

[4]The parties have not explained how a document dated Oct. 27, 1976, came to be executed "pursuant to" a judgment entered Nov. 8, 1976; however, they have so stipulated and so we have so found.

owing at the time of my death or retirement, as aforesaid, is determined by appropriate and reasonable proofs.

The assignment was filed with the plan administrator of the Sears plan (hereinafter sometimes referred to as the plan administrator). The $60 payments required under the divorce decree were deducted weekly from petitioner's pay check, beginning shortly after the divorce decree was entered and continuing until his retirement in January 1983. A total of $22,030 was paid to Yolanda in this manner.[5] Petitioner did not deduct any portion of this $22,030 as alimony on his tax returns for 1976 through 1983. Yolanda did not remember whether she included any of the $22,030 in her income for those years.

On his retirement, petitioner received a lump-sum distribution (within the meaning of section 402(e)) under the Sears plan in the amount of $182,481.39. The distribution consisted of 6,485 shares of Sears, Roebuck & Co. (hereinafter sometimes referred to as Sears) stock and a check in an amount exceeding $52,970. Petitioner deposited the check in his personal bank account. Sometime later, on two separate occasions, petitioner sold the Sears stock.

On February 1, 1983, petitioner drew a check on his personal account in the amount of $52,970, payable to Yolanda. In the "Memo" section of the check he wrote "Property Settlement." This amount represented the balance of the $75,000 due to Yolanda pursuant to the divorce decree. Yolanda did not report any portion of the $52,970 on her 1983 tax return.

The $182,481.39 lump-sum distribution under the Sears plan consisted entirely of contributions made by Sears and earnings on those contributions. Petitioner did not include in his gross income in the year contributed or in any other year the contributions Sears made under the Sears plan on his behalf, or the earnings on those contributions.

The plan administrator did not make any distribution under the plan directly to Yolanda. When petitioner retired

---

[5]The parties have stipulated to the rate of the payments ($60 per week) and the period of the payments ("commencing shortly after the divorce decree was entered [Nov. 8, 1976] and continuing until January of 1983"). At that rate and for that period, the payments should have totaled a little over $19,000. The parties have not explained the discrepancy between the latter amount and the stipulated $22,030 total payments. Our findings are in accordance with the parties' stipulations.

from Sears, the Sears plan contained a provision prohibiting any participant from assigning his or her benefits. This provision reads as follows:

7.7 *Non-Alienation of Benefits.* Except as otherwise expressly provided herein, no participant or beneficiary shall be entitled to withdraw, transfer, assign or hypothecate the money and securities, or any part thereof, credited to the participant's accounts in the [Sears plan]. No interest in the [Sears plan] shall be anticipated, charged or encumbered by any participant or beneficiary. Except as may be required by the tax withholding provisions of any statutes, the interest or interests of each and every participant or beneficiary in the [Sears plan] shall not be subject to, or reached by, any legal process in satisfaction of any debt, claim, liability or obligation—including alimony and child support payments—prior to the receipt thereof by the participant or beneficiary.

Petitioner reported $107,481.39 of the $182,481.39 lump-sum distribution on Form 4972 (Special 10-Year Averaging Method) included with his 1983 tax return. The difference between the amount reported and the amount received under the Sears plan is the $75,000 petitioner paid to Yolanda pursuant to the divorce decree. On the Form 4972, petitioner treated $85,274.49 of the $107,481.39 as capital gain and $22,206.90 as ordinary income. Petitioner did not file a Schedule D listing the $85,274.49 as capital gain or include the taxable portion of the capital gain on the appropriate line of the income section of his Federal individual income tax return. (See note 1, *supra.*)

OPINION

Petitioner seeks to exclude from income $75,000 of the $182,481.39 lump-sum distribution he received in 1983 under the Sears plan. He contends that, under Michigan law, the divorce decree and the assignment resulted in a 1976 legal transfer of $75,000 of petitioner's interest under the Sears plan. As a result, he maintains, when the 1983 distribution was made under the Sears plan, petitioner was not a distributee of the $75,000 and so that amount was not includable in his income under section 402. Alternatively, petitioner contends that, if he was a distributee, then he had a $75,000 investment in the contract by virtue of his payment to Yolanda, and was entitled to exclude that amount under section 72.

Respondent contends that "Since a plan cannot qualify under section 401(a) unless distributions are made to employees or their beneficiaries, and section 402(a)(1) applies to distributions of funds from a qualified plan, the term 'distributees' must be limited to employees or their beneficiaries." Respondent contends that Yolanda was not a designated beneficiary of the Sears plan nor did the plan ever pay anything to her. As a result, Yolanda could not be a distributee. Respondent argues further that the judicially created "family support" exception to the antiassignment rule of section 401(a)(13) does not relieve the distributee from the tax obligation imposed by section 402(a)(1). In addition, respondent contends that, even if the Sears plan would have paid the $52,970 balance directly to Yolanda, the payment was compensation for services rendered by petitioner and, as such, is taxable to him under the assignment of income doctrine. Finally, respondent argues that the payments petitioner made to Yolanda in settlement of a property distribution do not constitute an investment in the contract and, therefore, petitioner may not exclude those payments from the $182,481.39 distribution he received in 1983.

We agree with respondent's conclusions. In particular, we hold that, absent the statutory modifications enacted in 1984 (discussed *infra*), petitioner is the distributee of the entire 1983 lump-sum distribution and Yolanda is not the distributee of any part of it. Further, we hold that, under the special tax provisions that petitioner elected to apply to his lump-sum distribution (secs. 402(e), 72(f), and 402(a)(2)), no part of the $75,000 paid to Yolanda is excludable from petitioner's income. Finally, we conclude that, even if petitioner had not elected to apply the special lump-sum rules, section 72 would not allow petitioner to exclude any part of the $75,000.[6]

---

[6]Neither side in. the instant case contends that secs. 71 and 215 are applicable to the payments at issue here. We do not examine that issue. See, e.g., *Jackson v. Commissioner*, 54 T.C. 125, 129 (1970).

Gross income includes income from pensions. Sec. 61(a)(11).[7] In general, this income is taxable in the year in which it is received. Sec. 451(a).[8] However, for the employees' plan area, the Congress has provided more specialized rules. Under section 402(a)(1),[9] the general rule is that a distribution from an exempt employees' trust (under a tax-qualified employees' plan) is taxed to the "distributee" under section 72, which generally provides for current taxation of distributions as ordinary income.

We consider first whether petitioner or Yolanda is the distributee (sec. 402(a)(1)) and then how the distribution is to be taxed.

## I. *Who Is the Distributee?*

The statute does not define the word "distributee" as used in section 402(a)(1); neither do the regulations. Neither side has directed our attention to any cases that deal with the definition.

We conclude that a distributee of a distribution under a plan ordinarily is the participant or beneficiary who, under the plan, is entitled to receive the distribution. In particular, the mere fact that the distribution is made by the plan administrator to A rather than to B does not make A the distributee. Also, if a court order gives A an interest in B's interest under a plan, we do not search for the sometimes subtle State law distinction between whether A has been

---

[7]SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

* * * * * * *

(11) Pensions;

[8]SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

[9]Section 402(a)(1) provides, in pertinent part, as follows:

SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (4), the amount actually distributed to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed, under section 72 (relating to annuities). * * *

[The subsequent amendment of this provision by sec. 1011A(b)(8)(A) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3473, does not affect the instant case.]

thereby given an ownership interest or merely a security interest.

Thus, if a distribution is made under a plan and B is the participant or beneficiary entitled under the plan to receive the distribution, then B is the distributee in both of the above-noted hypothetical situations.

We believe that the contrary conclusions (and supporting analysis) advocated by petitioner are inconsistent with the statutory matrix which the Congress understood and modified in the Retirement Equity Act of 1984 (hereinafter sometimes referred to as REA '84), Pub. L. 98-397, 98 Stat. 1426, and the Tax Reform Act of 1986 (hereinafter sometimes referred to as TRA '86), Pub. L. 99-514, 100 Stat. 2085.

Our conclusions derive largely from the implications of later legislation. We are aware of the hazards of attempting to use a later statute to interpret an earlier one. Yet, when there is nothing better to guide us to the meaning of the statute, the actions of later Congresses "should not be rejected out of hand." *Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n.8 (1980). See *Boddie v. American Broadcasting Cos.* 881 F.2d 267, 269 (6th Cir. 1989). See generally *Estate of Ceppi v. Commissioner*, 78 T.C. 320, 324-325 (1982), and cases and materials there cited, affd. on other grounds 698 F.2d 17 (1st Cir. 1983).

With that caution, we proceed.

Before the enactment of the Employee Retirement Income Security Act of 1974 (hereinafter sometimes referred to as ERISA), Pub. L. 93-406, 88 Stat. 829, attachments of a participant's interest in a tax-qualified plan were not prohibited by the Internal Revenue Code. Section 1021(a) of ERISA added Code section 401(a)(13), which requires tax-qualified plans to provide "that benefits provided under the plan may not be assigned or alienated." Section 206(d)(1) of ERISA (29 U.S.C. 1056(d)(1)) sets forth the same rule for pension plans generally, whether or not tax-qualified. (Under section 3(2) of ERISA, "pension plan" is defined to include, for purposes of title I (the labor title) of ERISA, what the Internal Revenue Code refers to as "profit-sharing" plans.) Also, section 514(a) of ERISA (29 U.S.C. 1144(a)) provides that the labor title of ERISA preempts State laws.

Within a few years after the enactment of ERISA, disputes arose as to whether the ERISA preemption and antialienation provisions apply to family support obligations and State community property laws.

The Congress responded to this development by enacting REA '84, which it described as follows (S. Rept. 98-575, at 19, 1984-2 C.B. 447, 456):

*Explanation of Provision*

*In general*

The bill clarifies the spendthrift provisions by providing new rules for the treatment of certain domestic relations orders. In addition, the bill creates an exception to the ERISA preemption provision with respect to these orders. The bill also provides procedures to be followed by a plan administrator (including the Pension Benefit Guaranty Corporation (PBGC)) and an alternate payee (a child, spouse, former spouse, or other dependent of a participant) with respect to domestic relations orders.

Under the bill, if a domestic relations order requires the distribution of all or a part of a participant's benefits under a qualified plan to an alternate payee, then the creation, recognition, or assignment of the alternate payee's right to the benefits is not considered an assignment or alienation of benefits under the plan if and only if the order is a qualified domestic relations order. Because rights created, recognized, or assigned by a qualified domestic relations order, and benefit payments pursuant to such an order, are specifically permitted under the bill, State law providing for these rights and payments under a qualified domestic relations order will continue to be exempt from Federal preemption under ERISA.

To the same effect, see H. Rept. 98-655 (Part 1, Comm. on Education and Labor), at 39 (1984); H. Rept. 98-655 (Part 2, Comm. on Ways and Means), at 18 (1984).

The reasons why the Congress acted are set forth as follows (S. Rept. 98-575, at 18-19, 1984-2 C.B. 447, 456):

*Present Law*

Generally, under present law, benefits under a pension, profit-sharing, or stock bonus plan (pension plan) are subject to prohibitions against assignment or alienation (spendthrift provisions.) [sic] Under present law,[21] certain provisions of ERISA supersede (preempt) State laws relating to pension, etc., plans. A plan that does not include these required spendthrift provisions is not a qualified plan under the Code, and State law permitting such an assignment or alienation is generally preempted by ERISA.

Several cases have arisen in which courts have been required to determine whether the ERISA preemption and spendthrift provisions

apply to family support obligations (*e.g.,* alimony, separate maintenance, and child support obligations). In some of these cases, the courts have held that ERISA was not intended to preempt State domestic relations law permitting the attachment of vested benefits for the purpose of meeting these obligations.[22] Some courts have held that the ERISA preemption provision does not prevent application of State law permitting attachment of nonvested benefits for the purpose of meeting family support obligations.[23] There is a divergence of opinion among the courts as to whether ERISA preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan.[24]

The IRS has ruled that the spendthrift provisions are not violated when a plan trustee complies with a court order requiring the distribution of benefits of a participant in pay status to the participant's spouse or children in order to meet the participant's alimony or child support obligations.[25] The IRS has not taken any position with respect to this issue in cases in which the participant's benefits are not in pay status.

### *Reasons for Change*

The committee believes that the spendthrift rules should be clarified by creating a limited exception that permits benefits under a pension, etc., plan to be divided under certain circumstances. In order to provide rational rules for plan administrators, the committee believes it is necessary to establish guidelines for determining whether the exception to the spendthrift rules applies. In addition, the committee believes that conforming changes to the ERISA preemption provision are necessary to ensure that only those orders that are excepted from the spendthrift provisions are not preempted by ERISA.

---

[21] Sec. 514 of ERISA.

[22] *See, e.g., American Telephone and Telegraph Co. v. Merry,* 592 F.2d 118 (2d Cir. 1979); *Cody v. Riecker,* 594 F.2d 314 (2d Cir. 1979).

[23] *See, e.g., Weir v. Weir,* * * * [413] A.2d 638 ([N.J. Super Ct. Ch. Div.] 1980); *Kikkert v. Kikkert,* 427 A.2d 76 ([N.J. Super. App. Div.] 1981).

[24] In *Stone v. Stone,* * * * [632] F.2d 740 (9th Cir. 1980), the court held that ERISA was not intended to preempt community property laws and that a court order requiring a division of retirement benefits did not violate the anti-assignment provisions. In *Francis v. United Technology Corp.* 458 F. Supp. 84 (N.D. Cal. 1978), however, the court held that ERISA's preemption provision prevents the application of State community property law permitting attachment of plan benefits for family support purposes.

[25] Rev. Rul. 80-27, 1980-1 C.B. * * * [85].

To the same effect, see H. Rept. 98-655 (Part 1, Comm. on Education and Labor), at 39-43 (1984); H. Rept. 98-655 (Part 2, Comm. on Ways and Means), at 17-22 (1984).

The preemption provisions are modified by section 104(b) of REA '84. The antialienation provisions are modified by sections 104(a) and 204(a) and (b) of REA '84. (Section 204(b) of REA '84 adds section 414(p) to the Code, defining "qualified domestic relations order" (hereinafter sometimes referred to as QDRO) in almost three pages of detail.) In addition, section 204(c)(1) of REA '84 adds section 402(a)(9)[10] to the Code to provide for the taxabilityof an "alternate payee" (as defined in sec. 414(p)(8) as enacted by REA '84).[11]

Sections 402(a)(9) and 414(p)(8), as enacted by REA '84, provide that (1) if a QDRO designates the spouse, or a former spouse, child, or other dependent, of the plan participant as a person who is to receive the benefits payable with respect to the participant, then that payee is an "alternate payee" and (2) the alternate payee is to be treated as the "distributee" for purposes of determining taxability of the payments under the plan. In that situation, the alternate payee, and not the plan participant, would be taxed on the distributions to the alternate payee. These provisions took effect on January 1, 1985 (sec. 303(d) of REA '84, 98 Stat. 1453). TRA '86 modified section 402(a)(9), as enacted by REA '84, to provide that an alternate payee would be the distributee only if the alternate payee were the spouse or former spouse of the plan participant. (Sec. 1898(c)(1)(A) of TRA '86, 100 Stat. 2951.)

---

[10]SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

\*      \*      \*      \*      \*      \*      \*

(9) ALTERNATE PAYEE UNDER QUALIFIED DOMESTIC RELATIONS ORDER TREATED AS DISTRIBUTEE.—For purposes of subsection (a)(1) and section 72, the alternate payee shall be treated as the distributee of any distribution or payment made to the alternate payee under a qualified domestic relations order (as defined in section 414(p)).

[This provision took effect on Jan. 1, 1985 (sec. 303(d) of REA '84, 98 Stat. 1453). This provision was amended by sec. 1898(c)(1)(A) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2951), discussed *infra*.]

[11]SEC. 414. DEFINITIONS AND SPECIAL RULES.

\*      \*      \*      \*      \*      \*      \*

(p) QUALIFIED DOMESTIC RELATIONS ORDER DEFINED.—For purposes of this subsection and section 401(a)(13)—

\*      \*      \*      \*      \*      \*      \*

(8) ALTERNATE PAYEE DEFINED.—The term "alternate payee" means any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.

The explanation for the Congress' 1986 action is set forth as follows (S. Rept. 99-313, at 1103-1104, 1986-3 C.B. (Vol. 3) 1103-1104):

C. Qualified Domestic Relations Orders (sec. 1897(c) of the bill, sec. 206 of ERISA, and secs. 502 and 414(p) of the Code)

Under present law, neither ERISA nor the Code treats a qualified domestic relations order as a prohibited assignment or alienation of benefits under a pension plan. In addition, the Act creates an exception to the ERISA preemption provision only with respect to these orders.

A "qualified domestic relations order" is a domestic relations order that (1) creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to receive all or a portion of the benefits payable with respect to a participant under a pension plan, and (2) meets certain other requirements. A domestic relations order is any judgment, decree, or order (including approval of a property settlement agreement) that relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of the participant, and is made pursuant to a State domestic relations law (including community property law).

An alternate payee includes any spouse, former spouse, child, or other dependent of a participant who is recognized by a qualified domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to the participant.

The qualified domestic relations order provisions do not prevent the payment of amounts in pay status with respect to an alternate payee to a State agency that is an agent of an alternate payee or the payment of such amounts if the alternate payee consents to such payment (for example, to meet the requirements relating to Aid to Families with Dependent Children). In such a case, payment to the agency does not result in disqualification of the order and, under normal principles of constructive receipt, the alternate payee is treated as having received the amounts paid under the order.

1. Tax treatment of divorce distributions

### Present Law

Special rules are provided for determining the tax treatment of benefits subject to a qualified domestic relations order. For purposes of determining the taxability of benefits, the alternate payee is treated as a distributee with respect to payments received from or under a plan.

In addition, net employee contributions (together with other amounts treated as the participant's investment in the contract) are apportioned between the participant and the alternate payee under regulations prescribed by the Secretary of the Treasury.

### Explanation of Provision

The bill provides that the special rules for determining the taxability of benefits subject to a qualified domestic relations order apply only to

distributions made to an alternate payee who is the spouse or the former spouse of the participant. Thus, distributions to a spouse or former spouse generally will be included in the gross income of the spouse or former spouse. Under the bill, however, a distribution to an alternate payee other than a spouse (e.g., a child) is generally to be includible in the gross income of the participant. (For purposes of lump sum treatment, amounts paid to an alternate payee other than a spouse, or former spouse, shall be treated as part of the balance to the credit of the participant).

In addition, under the bill, the rules for allocating an employee's investment in the contract between the employee and an alternate payee apply only if the alternate payee is a spouse or former spouse of the participant.

If the alternate payee is not a spouse or former spouse, then the investment in the contract is not allocated to the alternate payee and is recovered by the participant under the general basis recovery rules applicable to the participant.

To substantially the same effect, see H. Rept. 99-426, at 1065-1066, 1986-3 C.B. (Vol. 2) 1065-1066; Staff of J. Comm. on Taxation, Explanation of Technical Corrections to the Tax Reform Act of 1984 and Other Recent Tax Legislation (JCS-11-87), at 222-223 (J. Comm. Print 1987) (hereinafter sometimes referred to as the staff blue book).

We have examined each of the opinions, and the ruling, cited in the REA '84 legislative history set forth *supra*, and also *Sav. & Profit Sharing Fund of Sears Emp. v. Gago*, 717 F.2d 1038 (7th Cir. 1983). The opinions deal with the ERISA preemption and antialienation provisions. Some of the opinions and the ruling deal with the Code's antialienation provision in the context of the tax-qualified status of the employees' plan there involved. Neither the ruling nor any of the opinions deals with the question of who is the distributee, or with any other aspect of who is to include the distribution (or any part thereof) in income.

We conclude that the person to whom a distribution is made is not thereby automatically the distributee. Our conclusion is based on the Congress' decision to enact section 402(a)(9) in REA '84, as well as the form of section 402(a)(9). If section 402(a)(1) were understood to impose a tax on the recipient of a distribution, then it would automatically follow that obedience to a QDRO would result in the alternate payee being taxed. The fact that the Congress thought statutory language was needed in order

to achieve the result of taxing the alternate payee indicates that the Congress thought that otherwise someone else would be taxed under section 402(a)(1). The form of section 402(a)(9) as enacted by REA '84, providing that "the alternate payee shall *be treated* as the distributee" (emphasis added), further indicates that the Congress understood that the alternate payee is not really the "distributee" even though the alternate payee receives the distribution under the plan.

Finally, the TRA '86 amendment also requires the conclusion we have set forth. The present language of sections 402(a)(1) and 402(a)(9) as amended by TRA '86 does not specifically state any rule as being applicable to alternate payees who are children or other dependents of the plan participant. If "distributee" means "recipient", then children and other dependents who are recipients under QDRO's are thereby distributees. However, the committee reports (and the staff blue book) for TRA '86 make it plain that the Congress understood that the effect of the TRA '86 amendment is that a distribution under a QDRO to a child or other dependent is "includible in the gross income of the participant." This result can follow only if "distributee" does not mean "recipient".

Analysis of the same materials causes us to conclude that the owner of the interest under the plan is not thereby the distributee. Under the statute (section 414(p)(1)(A)(i) as enacted by REA '84[12]), the status of an order as a QDRO is not affected by whether the order makes the alternate payee an owner of the interest under the plan or merely gives the owner a lien or other security interest in the plan. (Cf. *Daniel v. Commissioner*, 56 T.C. 655, 659 (1971), affd. 461 F.2d 1265 (5th Cir. 1972), relating to an interest in a testamentary trust.) The focus is designation of a right to

---

[12] SEC. 414. DEFINITIONS AND SPECIAL RULES.

     *     *     *     *     *     *     *

(p) QUALIFIED DOMESTIC RELATIONS ORDER DEFINED.—For purposes of this subsection and section 401(a)(13)—

    (1) IN GENERAL.—

        (A) QUALIFIED DOMESTIC RELATIONS ORDER.—The term "qualified domestic relations order" means a domestic relations order—

            (i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, * * *

receive a benefit payable under the plan. If "distributee" had meant "owner", then children and other dependents who are awarded ownership interests would thereby be distributees. However, the TRA '86 legislative history makes it plain that distributions to children and other dependents are includable in the participants' incomes. This result can follow only if "distributee" does not mean "owner".

A conclusion that "distributee" means "participant (or beneficiary) under the plan" appears to be consistent with the Congress' understanding when it enacted REA '84 and TRA '86. We do not have to decide in the instant case whether that is the definitive or only meaning of "distributee". It is enough for purposes of the instant case to conclude that that approximates the meaning of "distributee", that that results in requiring the distribution to be included in petitioner's income, and that no alternative pointing to Yolanda as distributee is tenable.

Petitioner does not contend that the divorce decree would constitute a QDRO. Even if the divorce decree would constitute a QDRO under the REA '84 amendments' definition, that would not help petitioner. Although the REA '84 amendments may be said to "clarify" prior law as to the preemption and antialienation rules enacted by ERISA, the REA '84 amendments clearly changed prior law as to taxability under section 402. And, although we use the REA '84 amendments to help us understand what prior law was, the amendments themselves did not take effect until almost 2 years after the distribution in issue in the instant case. We have no authority to apply the REA '84 amendments with retroactivity that the Congress did not choose to provide. *Gunther v. Commissioner*, 909 F.2d 291, 297 (7th Cir. 1990), affg. 92 T.C. 39 (1989); *Sallies v. Commissioner*, 83 T.C. 44, 53 n.12 (1984).

Petitioner points out that "distributee" appears twice and "employee" appears once in section 402(a)(1). He concludes that this means that "distributee" is not the same as "employee". We agree with that conclusion, but we do not agree that that conclusion helps petitioner's case.

The second sentence of section 402(a)(1) uses "employee" in providing that "The amount actually distributed to any distributee shall not include net unrealized appreciation in

securities of the employer corporation attributable to the amount contributed by the employee". The relevant contributions are those of the employee. The distributee may be the participant or the participant's beneficiary. (The Sears plan provides that each participant may designate a beneficiary "to whom his interest in the Fund is to be paid if he dies before he receives all of such interest." If there were no effective beneficiary designation when the participant dies, then the fund would pay the interest to (1) the surviving spouse, if any, or (2) the estate.) Under the Sears plan, Yolanda could have been designated petitioner's beneficiary, but she could not be a distributee on the facts of the instant case because petitioner was alive when the distribution in dispute was made. Under the terms of the Sears plan, the beneficiary can take only if the participant is dead. Thus, the statute draws a distinction between "distributee" and "employee", but that distinction does not apply under the facts of the instant case.

In our research we did not find any cases directly on point with the instant case. We did, however, find Memorandum Opinions in which this Court held that the nonemployee spouse must include in income pension benefits paid to her as her share of her former husband's retirement benefits. Each of these Memorandum Opinions, *Eatinger v. Commissioner*, T.C. Memo. 1990-310, *Denbow v. Commissioner*, T.C. Memo. 1989-92, and *Lowe v. Commissioner*, T.C. Memo. 1981-350, involved a determination of the effect of community property laws on the incidence of taxation of distributions under Federal military retirement programs. Since the instant case does not involve community property and does not involve Federal military retirement programs (which are subject to other statutes), we do not have to determine in the instant case how section 402(a)(1) is to interact with those other laws. As to the precedential value of Memorandum Opinions, see, e.g., *Newman v. Commissioner*, 68 T.C. 494, 502 n.4 (1977).

We hold, for respondent, that petitioner (and not Yolanda) was the distributee (within the meaning of section 402(a)(1)) of the entire distribution here in dispute.

## II. *Taxability of the Distribution*

Preliminarily, we note that the apparent effect of petitioner's contention that section 72 authorizes him to exclude $75,000 from income—if we were to agree with it—is that no one would be taxed on the $75,000. Petitioner would not be taxed because he had an investment in the contract and Yolanda would not be taxed because she was not the distributee. Unless the Congress has clearly provided otherwise, we should not interpret the Code to result in such a double benefit. See *United States v. Skelly Oil Co.,* 394 U.S. 678, 684 (1969); *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934). We do not lightly assume that the Congress has legislated eccentrically. *J.C. Penney Co. v. Commissioner*, 312 F.2d 65, 68 (2d Cir. 1962), affg. 37 T.C. 1013 (1962). Only if the language of the statute or the legislative history compelled it would we reach a result apparently so at odds with accepted tax policy. Cf. *Haserot v. Commissioner*, 41 T.C. 562, 572 (1964), affd. sub nom. *Commissioner v. Stickney*, 399 F.2d 828 (6th Cir. 1968).

Although the general rule of section 402(a)(1) (note 9, *supra*) provides that a distributee under a tax-qualified plan is to be taxed under section 72, the Congress has provided an alternative for lump-sum distributions, taxable under sections 402(a)(2)[13] (capital gains) and 402(e)[14] (10-year averag-

---

[13]Sec. 402(a)(2) provides, in pertinent part, as follows:

SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

* * * * * * *

(2) CAPITAL GAINS TREATMENT FOR PORTION OF LUMP SUM DISTRIBUTIONS.—In the case of an employee trust described in section 401(a), which is exempt from tax under section 501(a), so much of the total taxable amount (as defined in subparagraph (D) of subsection (e)(4)) of a lump sum distribution as is equal to the product of such total taxable amount multiplied by a fraction—

(A) the numerator of which is the number of calendar years of active participation by the employee in such plan before January 1, 1974, and

(B) the denominator of which is the number of calendar years of active participation by the employee in such plan, shall be treated as a gain from the sale or exchange of a capital asset held for more than 1 year. * * *

[The subsequent repeal of this provision by sec. 1122(b)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2466, applies to amounts distributed after Dec. 31, 1986, and so does not affect the instant case.]

[14] Sec. 402(e) provides, in pertinent part, as follows:

SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

* * * * * * *

(e) TAX ON LUMP SUM DISTRIBUTIONS.—

(1) IMPOSITION OF SEPARATE TAX ON LUMP SUM DISTRIBUTIONS.—

ing). The parties have stipulated that the 1983 distribution to petitioner was a lump-sum distribution. An examination of petitioner's 1983 tax return makes it plain that petitioner elected the special lump-sum distribution tax treatment.

Under section 402(a)(2), a portion of the distribution, determined by reference to "the total taxable amount (as defined in subparagraph (D) of subsection (e)(4))", is treated as a capital gain. The 10-year averaging rule of section 402(e) also depends on a determination of the total taxable amount. Section 402(e)(4)(D) defines the total taxable amount as the amount of the lump-sum distribution, reduced by the sum of—

(i) the amounts considered contributed by the employee (determined by applying section 72(f)) * * *

and unrealized appreciation in employer securities. (There is no dispute about the treatment of the unrealized appreciation in employer securities in the instant case.)

(A) SEPARATE TAX.—There is hereby imposed a tax (in the amount determined under subparagraph (B)) on the ordinary income portion of a lump sum distribution.

(B) AMOUNT OF TAX.—The amount of tax imposed by subparagraph (A) for any taxable year shall be an amount equal to the amount of the initial separate tax for such taxable year multiplied by a fraction, the numerator of which is the ordinary income portion of the lump sum distribution for the taxable year and the denominator of which is the total taxable amount of such distribution for such year.

(C) INITIAL SEPARATE TAX.—The initial separate tax for any taxable year is an amount equal to 10 times the tax which would be imposed by subsection (c) of section 1 if the recipient were an individual referred to in such subsection and the taxable income were an amount equal to the zero bracket amount applicable to such an individual for the taxable year plus one-tenth of the excess of—

(i) the total taxable amount of the lump sum distribution for the taxable year, over

(ii) the minimum distribution allowance.

*       *       *       *       *       *       *

(4) DEFINITIONS AND SPECIAL RULES.—

*       *       *       *       *       *       *

(D) TOTAL TAXABLE AMOUNT.—For purposes of this section and section 403, the term "total taxable amount" means, with respect to a lump sum distribution, the amount of such distribution which exceeds the sum of—

(i) the amounts considered contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, and

(ii) the net unrealized appreciation attributable to that part of the distribution which consists of the securities of the employer corporation so distributed.

[The subsequent amendments of these provisions by secs. 104(b)(5), 1122(a)(2), and 1122(b)(2)(B) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2105, 2466, 2467), and by pars. (8)(E) and (10) of sec. 1011A(b) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3474), do not affect the instant case. The amendments made by sec. 1122(a)(2) of the 1986 Act changed the provision from 10-year averaging to 5-year averaging.]

Section 72(f)[15] provides that amounts contributed by the employer shall be considered as contributed by the employee only to the extent that (1) the employer's contributions were includable in the employee's gross income or (2) the employer's contributions would not have been includable in the employee's gross income if they had been paid directly to the employee instead of contributed under the plan.

As to the first alternative, the parties have stipulated that (a) the 1983 lump-sum distribution consists entirely of Sears' contributions and (b) the contributions were not included in petitioner's gross income. As to the second alternative, no evidence appears, and no contention is made by petitioner, that petitioner could have properly excluded Sears' contributions from his gross income if the contributions had been paid directly to him instead of having been made under the Sears plan. See sec. 1.72-8(a)(5), Income Tax Regs.[16]

---

[15]Sec. 72(f) provides, in pertinent part, as follows:

SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

\* \* \* \* \* \* \*

(f) SPECIAL RULES FOR COMPUTING EMPLOYEES' CONTRIBUTIONS.—In computing, for purposes of subsection (c)(1)(A), the aggregate amount of premiums or other consideration paid for the contract, for purposes of subsection (d)(1), the consideration for the contract contributed by the employee, and for purposes of subsection (e)(1)(B), the aggregate premiums or other consideration paid, amounts contributed by the employer shall be included, but only to the extent that—

(1) such amounts were includible in the gross income of the employee under this subtitle or prior income tax laws; or

(2) if such amounts had been paid directly to the employee at the time they were contributed, they would not have been includible in the gross income of the employee under the law applicable at the time of such contribution. \* \* \*

[The subsequent amendments of this provision, by sec. 1852(c)(3) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2867), and sec. 1011A(b)(1) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3472), do not affect the instant case.]

[16]Sec. 1.72-8. *Effect of certain employer contributions with respect to premiums or other consideration paid or contributed by an employee.* (a) *Contributions in the nature of compensation*—

\* \* \* \* \* \* \*

(5) *Amounts not includible in gross income of employee under subtitle A of the Code or prior income tax laws.* Amounts contributed by an employer which were not includible in the gross income of the employee under subtitle A of the Code or prior income tax laws, but which would have been includible therein had they been paid directly to the employee, do not constitute consideration paid or contributed by the employee for the purposes of section 72. For example, contributions made by an employer under a qualified employees' trust or plan, which contributions would have been includible in the gross income of the employee had such contributions been paid to him directly as compensation, do not constitute consideration paid or contributed by the employee. Accordingly, the aggregate amount of premiums or other

Thus, under section 72(f), no part of the lump-sum distribution is treated as having been contributed by petitioner, and under section 402(e)(4)(D), the total taxable amount is the total amount of the lump-sum distribution. It follows that the entire lump-sum distribution is taken into account in determining petitioner's tax liability under the method that petitioner chose in reporting the lump-sum distribution on his 1983 tax return.

We conclude that petitioner may not reduce the amount of the lump-sum distribution by any amount he paid to Yolanda.

We believe that the result would have been the same under section 72 even if petitioner had not elected the special tax treatment for lump-sum distributions.

Section 72(b) provides the exclusion ratio rules for amounts received as annuities, and section 72(e) provides the rules for amounts not received as annuities. Both subsections require exclusion of amounts which constitute investment in the contract. For section 72(b) the definition is provided in section 72(c)(1), and for section 72(e) the definition is provided in section 72(e)(6). Section 72(f), which we have already considered (see note 15, *supra*), then provides rules for those definitions. Once again, petitioner confronts the barrier that—

(1) amounts contributed by the employer are treated as "premiums or other consideration paid" by the employee only if (a) those amounts had been included in the employee's gross income or (b) those amounts would not have been includible in the employee's gross income if they had been paid directly to the employee instead of contributed under the plan,

(2) the 1983 distribution consists entirely of contributions made by Sears,

(3) the contributions were not included in petitioner's gross income, and

(4) if Sears had paid the amounts directly to petitioner instead of contributing them under the plan then the amounts apparently would have been includible in petitioner's gross income.

Thus, even if petitioner had not elected to be taxed under the special lump-sum distribution rules, the regular rules of

consideration paid or contributed by an employee, insofar as compensatory employer contributions are concerned, consists solely of the (i) sum of all amounts actually contributed by the employee, plus (ii) contributions in the nature of compensation which are deemed to be paid or contributed by the employee under this paragraph.

section 72 would have barred him from excluding any part of the $75,000 that was paid to Yolanda.

Petitioner relies on *Gasman v. Commissioner*, T.C. Memo. 1967-42, in support of his position that the $75,000 he paid to Yolanda should be treated as his investment in the contract. In *Gasman*, the taxpayer, pursuant to a settlement agreement entered into by the taxpayer and his former wife incident to their divorce, paid $9,000 to his former wife for her interest in certain property they had acquired as tenants by the entirety during the marriage. The taxpayer later sold this property during one of the years in suit. We determined that the taxpayer's basis in the property was increased by the $9,000 he paid to his former wife for her interest in the property.

The facts of *Gasman* are distinguishable from the facts in the instant case. In *Gasman* the former wife's interest in the property arose before the divorce. There, the taxpayer purchased his former wife's preexisting interest in the property for cash. In the instant case, there is no evidence that Yolanda had an interest in the Sears plan before the divorce decree. Moreover, neither petitioner nor Yolanda made contributions under the Sears plan. The portion of the lump sum distribution petitioner paid to Yolanda came from previously untaxed employer contributions and earnings attributable to those contributions. Also, neither petitioner nor Yolanda recognized income on the division of petitioner's interest in the Sears plan as a result of the divorce. Consequently, neither petitioner nor Yolanda had any basis in the Sears plan which petitioner could use to reduce the taxable portion of the distribution.

Petitioner further contends that, under section 72(g)(1),[17]

---

[17]SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

\* \* \* \* \* \* \*

(g) RULES FOR TRANSFEREE WHERE TRANSFER WAS FOR VALUE.—Where any contract (or any interest therein) is transferred (by assignment or otherwise) for a valuable consideration, to the extent that the contract (or interest therein) does not, in the hands of the transferee, have a basis which is determined by reference to the basis in the hands of the transferor, then—

(1) for purposes of this section, only the actual value of such consideration, plus the amount of the premiums and other consideration paid by the transferee after the transfer, shall be taken into account in computing the aggregate amount of the premiums or other consideration paid for the contract;

\* \* \* \* \* \* \*

to the extent he is considered a distributee with respect to all or any portion of the $75,000, he must also be treated as having paid valuable consideration to his former spouse for the right to receive that portion as to which he is considered a distributee. Respondent argues that there is no evidence that Yolanda transferred to petitioner a contract or interest in a qualified plan; accordingly, section 72(g) does not apply. We agree with respondent's conclusion.

Under section 72(g), a transferee of a contract subject to section 72 becomes an investor in the contract when a policy or any interest in the policy is transferred to the transferee for a valuable consideration. The transferee's investment in the contract then is limited to the actual value of the consideration paid to the transferor for the contract plus any premiums and other consideration the transferee pays on the contract after the transfer. Sec. 72(g)(1). See *Hacker v. Commissioner*, 36 B.T.A. 659, 662 (1937). However, petitioner received his interest in the Sears plan because of his status as an employee of Sears, not because he paid $75,000 to Yolanda. Yolanda did not transfer any interest in the Sears plan to petitioner.

In the instant case, petitioner paid $75,000 to Yolanda as a property settlement for her interest in the marital estate, not as consideration for her interest, if any, in the Sears plan. Consequently, petitioner may not exclude from income any portion of his 1983 lump-sum distribution, merely because of the requirement (which he honored) that a portion of the distribution go to Yolanda.

We hold for respondent on this issue.

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

For purposes of this subsection, the term "transferee" includes a beneficiary of, or the estate of, the transferee.