T.C. Summary Opinion 2005-68


UNITED STATES TAX COURT


MARGRET LOUISE KELLEY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6639-04S.               Filed June 2, 2005.


Margret Louise Kelley, pro se.

<u>Beth A. Nunnink</u>, for respondent.


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.[1]  The decision to

_____

[1]  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for 2001, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 2001 in the amount of $633. However, prior to trial, respondent filed a motion for leave to file answer out of time in order to assert an increased deficiency. See sec. 6214(a). Petitioner did not object to respondent's motion, and the Court granted it. Accordingly, the deficiency at issue in this case is $1,900.

After a concession by petitioner,[2] the only issue for decision is whether a $16,909 distribution made to petitioner as an alternate payee under a qualified domestic relations order is taxable to her as the distributee of such distribution. We hold that it is.

## Background

Some of the facts have been stipulated, and they are so found.

At the time that the petition was filed, petitioner resided in Asheville, North Carolina.

Petitioner and William A. Kelley (Mr. Kelley) were married in August 1954. The couple separated on June 11, 1986. Thereafter, in December 1986, the Superior Court of Orange

---

[2] Petitioner concedes that a capital gain distribution of $138 that she received from Wachovia Securities Inc. is includable in her income.

County, California (the Superior Court), entered a judgment of dissolution of marriage.

In June 1962, Mr. Kelley began employment with Aerospace Corp. of El Segundo, California. In July 1963, Mr. Kelley became a participant in the Aerospace Employees' Retirement Plan (Retirement Plan).[3] Mr. Kelley retired from Aerospace Corp. in November 1985.

Incident to the matrimonial action between petitioner and Mr. Kelley, the Superior Court issued an Order On Division Of Aerospace Employees' Retirement Plan Benefits in July 1986. In its order, the Superior Court found that Mr. Kelley had earned benefits under the Retirement Plan, which the court decided were community property in their entirety. The Superior Court also decided that petitioner had a 50-percent interest in those benefits, and it directed the Retirement Plan to pay petitioner her community interest in those benefits. The Superior Court expressly retained jurisdiction "to make such further orders as are deemed appropriate to enforce or clarify the provisions of this order."

In December 1992, the Superior Court entered a Stipulated Qualified Domestic Relations Order (QDRO), which was approved as to form and content by petitioner and Mr. Kelley, as well as

---

[3] Mr. Kelley's interest in the Retirement Plan was funded by Aerospace Corp.

their attorneys, and the plan administrator of the Retirement Plan. The QDRO stated, in relevant part, that petitioner, Mr. Kelley, and the Superior Court intended that the QDRO be a qualified domestic relations order within the meaning of the Internal Revenue Code of 1986, as amended.[4] The QDRO also identified Mr. Kelley as the "plan participant" and petitioner as the "alternate payee". As to petitioner, the QDRO included the following provisions:

> 4. This Order hereby creates and recognizes as to the [Aerospace Employees' Retirement] Plan described above the existence of the Alternate Payee's right as of June 11, 1986 to 50% in said Plan, plus any cost of living adjustments.

> 5. The Alternate Payee elects the SINGLE LIFE ANNUITY under the Plan to receive her benefits in the Plan created and recognized in Paragraph 4 of this Order.

After entry of the QDRO, petitioner began to receive, directly from the administrator of the Retirement Plan, her 50-percent interest in Mr. Kelley's retirement benefits. Petitioner received these benefits through direct deposit to her bank account on the first of each month. Shortly after the end of each calendar year, petitioner also received a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., or similar

---

[4] The order also stated that it was "intended to be a QDRO pursuant to the [California Family Law] Act, and its provisions shall be administered and interpreted in conformity with the Act."

statement, from the Retirement Plan reporting the amount of the distribution.

During 2001, petitioner received $16,909 pursuant to the QDRO. On her return for that year, petitioner disclosed this amount in its entirety on line 16a, "Total pensions and annuities", but reported "0" on line 16b as the taxable amount. In explanation, petitioner wrote "see addendum (commun. prop.)" and attached to her return a copy of the Superior Court's July 1986 order. Petitioner had consistently followed this approach for every year that she had received a distribution.

Respondent contends that the amount actually paid to petitioner in 2001, i.e., $16,909, is includable, in its entirety, in petitioner's income for that year. Petitioner contends that she received no property settlement per se in her divorce from Mr. Kelley and that her community property interest in his retirement benefits is essentially a "return of capital" and therefore not taxable. Petitioner also points out that on three separate occasions over the years, respondent's Service Centers have issued "no change" letters after inquiring into the status of her interest in Mr. Kelley's retirement benefits.

## Discussion[5]

Generally, under section 402(a), a distribution from a qualified retirement plan is taxable to the distributee.[6] Neither the Code nor the regulations define the term "distributee". The Court, however, has construed the term to mean the participant or beneficiary who, under the plan, is entitled to receive the distribution. Darby v. Commissioner, 97 T.C. 51, 58 (1991); Estate of Machat v. Commissioner, T.C. Memo. 1998-154. In the present case, Mr. Kelley would be the distributee because, under the Retirement Plan, he is the participant or beneficiary who is entitled to receive the distribution.

However, section 402(e)(1)(A) provides an exception to the general rule of section 402(a). Thus, section 402(e)(1)(A) provides that for purposes of section 402(a);

> an alternate payee who is the spouse or former spouse of the participant shall be treated as the distributee of any distribution or payment made to the alternate payee under a qualified domestic relations order (as defined in section 414(p)).

---

[5] We decide the issue in this case without regard to the burden of proof. See generally sec. 7491(a); Rule 142(a); INDOPCO Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[6] Neither party has raised any issue regarding the qualified status of the Retirement Plan. Suffice it to say that there is nothing in the record that would lead us to think that the employees' trust is not described in sec. 401(a) and not exempt from tax under sec. 501(a).

In other words, a distribution made to an alternate payee under a qualified domestic relations order will be taxable to the alternate payee, and not to the plan participant or beneficiary, because section 402(e)(1)(A) treats the alternate payee as the distributee of the distribution. <u>Seidel v. Commissioner</u>, T.C. Memo. 2005-67.

As relevant herein, section 414(p)(1)(A) defines a "qualified domestic relations order" as a domestic relations order "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan". The term "domestic relations order" means any judgment, decree, or order that relates to the provision of alimony payments or marital property rights to a spouse or former spouse of a plan participant and that is made pursuant to a State domestic relations law, specifically including a community property law. Sec. 414(p)(1)(B); see <u>Dunkin v. Commissioner</u>, 124 T.C. ___ (2005) (slip op. at 6-7) (discussing relevant principles of California community property law).

In the present case, neither party has raised any issue regarding the status of the Superior Court's December 1992 order as a qualified domestic relations order, and there is nothing in the record that would lead us to question its status as such.

Indeed, the Superior Court's order expressly states that the parties and the court intend that it constitute a qualified domestic relations order within the meaning of the Internal Revenue Code; moreover, all of the requirements of section 414(p)(1) through (3) appear to be satisfied. See generally Brotman v. Commissioner, 105 T.C. 141, 147, 149-150 (1995); Burton v. Commissioner, T.C. Memo. 1997-20.

In sum, the $16,909 distribution that was received by petitioner in 2001 from the Retirement Plan was received by her as an alternate payee under a qualified domestic relations order. Accordingly, pursuant to section 402(e)(1)(A), petitioner is treated as the distributee of the distribution and, pursuant to section 402(a), the distribution is includable in her income.

We recognize that from a property perspective, petitioner might not have taken anything from her 32-year marriage other than a 50-percent interest in Mr. Kelley's retirement plan. Unfortunately for petitioner, this fact does not serve to overcome the clear mandate of section 402 defining the taxability of distributions from an employees' trust.

Finally, we recognize that on several occasions in the past, respondent's Service Centers apparently issued "no change" letters to petitioner after inquiring into the status of her

interest in Mr. Kelley's retirement benefits.[7]  Suffice it to say that the "mere acceptance or acquiescence in returns filed by a taxpayer in previous years creates no estoppel against the Commissioner nor does the overlooking of an error in a return upon audit create any such estoppel."  Mora v. Commissioner, T.C. Memo. 1972-123; see Dixon v. United States, 381 U.S. 68, 72-73 (1965); Automobile Club of Mich. v. Commissioner, 353 U.S. 180, 183-184 (1957); McGuire v. Commissioner, 77 T.C. 765, 779-780 (1981).  In other words, even though the Commissioner may have overlooked or accepted the tax treatment of a certain item on a taxpayer's returns for many previous years, the Commissioner is not precluded from correcting that error on the taxpayer's return for a subsequent year.  Garrison v. Commissioner, T.C. Memo. 1994-200 (and cases cited therein), affd. without published opinion 67 F.3d 299 (6th Cir. 1995).

In conclusion, we hold for respondent on the disputed issue.

Reviewed and adopted as the report of the Small Tax Case Division.

---

[7]  The record does not disclose what prompted respondent's Service Centers to issue the "no change" letters.  Perhaps the Service Centers acted solely on the basis of the Superior Court's July 1986 order and without knowledge of the December 1992 QDRO.  However, we need not speculate on this matter because, as discussed infra in the text, respondent is not estopped from correcting an error.

To reflect our disposition of the disputed issue, as well as petitioner's concession,[8]

Decision will be entered for respondent in the amount of the increased deficiency of $1,900.

---

[8]  See *supra* note 2.